**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **ANTOINETTE L. PACK,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | )    **Civil Action No. 07-522** |
| | )    **Judge Lancaster** |
| **MICHAEL J. ASTRUE,** | ) |
| **COMMISSIONER OF SOCIAL** | ) |
| **SECURITY,** | ) |
| | ) |
| **Defendant.** | ) |

**MEMORANDUM OPINION AND ORDER OF COURT**

Gary L. Lancaster,
District Judge

April _____, 2008

## I.   **Introduction**

Plaintiff Antoinette L. Pack ("Pack") brings this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), seeking judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying her applications for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act ("Act") [42 U.S.C. §§ 401-433 and 1381-1383(f)]. For the reasons that follow, the Court will vacate the decision of the Commissioner and remand this case for further administrative proceedings.

## II.   **Background**

Pack is a female who was born on January 27, 1960. (R. at 510). Although she dropped out of school after completing the

1

tenth grade, she obtained a General Educational Development ("GED") diploma. (R. at 510-511). Her past relevant work includes work as a nurse's aide, a housekeeper, a house attendant and an office cleaner. (R. at 511-513). At the time of the administrative decision currently under review, Pack was forty-five years old.

Pack initially filed applications for DIB and SSI on January 27, 2000, alleging disability as of October 31, 1997, due to an injury to her left hand. (Doc. No. 14-2 at 4). In a decision dated September 26, 2000, Administrative Law Judge Frank DiCenzo determined that Pack had been "disabled" within the meaning of the Act between October 31, 1997, and June 9, 1999. (Id. at 4-13). Hence, she was entitled to a period of disability and DIB for this closed period of time. Nevertheless, it was determined that she had been capable of returning to work as of June 10, 1999. Believing that she was still disabled, Pack filed new applications for DIB and SSI on September 7, 2001, and October 18, 2001, respectively. (R. at 60-63, 489-490). These applications were denied by the state agency on January 25, 2002. (R. at 39-42, 492-495). Pack took no further action at that time.

Pack proceeded to file new applications for SSI and DIB on June 21, 2003, and July 7, 2003, respectively. (R. at 64-66, 496-497). The state agency denied these claims on November 6, 2003, thereby prompting Pack to file a timely request for an administrative hearing. (R. at 43-47, 500-503). On March 15,

2

2005, a hearing was held in Pittsburgh, Pennsylvania, before Administrative Law Judge Melvin Rosenberg. (R. at 507). Pack, who was represented by counsel, appeared and testified at the hearing. (R. at 509-542). Frances Kinley ("Kinley"), an impartial vocational expert, was present for the entire hearing and testified before its conclusion. (R. at 537-541). In a decision dated June 21, 2005, Judge Rosenberg determined that Pack was not disabled within the meaning of the Act and, hence, not entitled to DIB and SSI. (R. at 14-24). The Appeals Council denied Pack's request for review on March 16, 2007, thereby making Judge Rosenberg's decision the final decision of the Commissioner in this case. (R. at 6-8).

Pack was apparently insured for DIB only through December 31, 2002. (R. at 18). She filed a new application for SSI on June 22, 2005, alleging disability as of that date. (R. at 31). That claim proceeded through the administrative process. On March 30, 2007, Administrative Law Judge Timothy Pace issued a decision in which he determined that Pack had not been statutorily disabled at any time on or after June 22, 2005. (R. at 28-38). Pack commenced this action against the Commissioner on April 20, 2007, seeking judicial review of Judge Rosenberg's decision of June 21, 2005. (Doc. No. 1). In accordance with the Act, the Commissioner was required to file "a certified copy of the transcript of the record" as a part of its answer. 42 U.S.C. § 405(g). Portions of the record included documentation related to Pack's later SSI claim. Pack

3

filed a motion to strike those portions of the record on August 1, 2007, arguing that information pertaining to Judge Pace's denial of her SSI claim was not properly before the Court because that matter was still pending before the Appeals Council. (Doc. No. 8). Although the Court denied Pack's motion to strike, the Court acknowledged that it would consider only those matters which were properly before the Court. (Doc. No. 9). The Commissioner filed a revised certified copy of the transcript on September 17, 2007. (Doc. No. 12). Pack and the Commissioner filed motions for summary judgment on September 24, 2007, and October 10, 2007, respectively. (Doc. Nos. 13 & 15). The Court reviews only the decision of Judge Rosenberg (the "ALJ").

## III. Standard of Review

This Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence. 42 U.S.C. § 405(g); *Adorno v. Shalala*, 40 F.3d 43, 46 (3d Cir. 1994). The Court may not undertake a *de novo* review of the Commissioner's decision or re-weigh the evidence of record. *Monsour Medical Center v. Heckler*, 806 F.2d 1185, 1190 (3d Cir. 1986). Congress has clearly expressed its intention that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive[.]" 42 U.S.C. § 405(g). Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind

might accept as adequate to support a conclusion." *Pierce v. Underwood*, 108 S.Ct. 2541, 2545 (1988). As long as the Commissioner's decision is supported by substantial evidence, it cannot be set aside even if this Court "would have decided the factual inquiry differently." *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999). "Overall, the substantial evidence standard is a deferential standard of review." *Jones v. Barnhart*, 364 F.3d 501, 503 (3d Cir. 2004).

In order to establish a disability under the Act, a claimant must demonstrate a "medically determinable basis for an impairment that prevents [her] from engaging in any 'substantial gainful activity' for a statutory twelve-month period." *Stunkard v. Secretary of Health and Human Services*, 841 F.2d 57, 59 (3d Cir. 1988); 42 U.S.C. §§ 423(d)(1), 1382c(a)(3)(A). A claimant is considered to be unable to engage in substantial gainful activity "only if [her] physical or mental impairment or impairments are of such severity that [she] is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

To support his ultimate findings, the Commissioner must do more than simply state factual conclusions. He must make specific findings of fact. *Stewart v. Secretary of HEW*, 714 F.2d 287, 290 (3d Cir. 1983). An administrative law judge must consider all

5

medical evidence contained in the record and provide adequate explanations for disregarding or rejecting evidence. *Weir on Behalf of Weir v. Heckler*, 734 F.2d 955, 961 (3d Cir. 1984); *Cotter v. Harris*, 642 F.2d 700, 705 (3d Cir. 1981).

The Social Security Administration ("SSA"), acting pursuant to its legislatively delegated rulemaking authority, has promulgated a five-step sequential evaluation process for the purpose of determining whether a claimant is "disabled" within the meaning of the Act. The United States Supreme Court recently summarized this process as follows:

> If at any step a finding of disability or non-disability can be made, the SSA will not review the claim further. At the first step, the agency will find non-disability unless the claimant shows that he is not working at a "substantial gainful activity." [20 C.F.R.] §§ 404.1520(b), 416.920(b). At step two, the SSA will find non-disability unless the claimant shows that he has a "severe impairment," defined as "any impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities." §§ 404.1520(c), 416.920(c). At step three, the agency determines whether the impairment which enabled the claimant to survive step two is on the list of impairments presumed severe enough to render one disabled; if so, the claimant qualifies. §§ 404.1520(d), 416.920(d). If the claimant's impairment is not on the list, the inquiry proceeds to step four, at which the SSA assesses whether the claimant can do his previous work; unless he shows that he cannot, he is determined not to be disabled. If the claimant survives the fourth stage, the fifth, and final, step requires the SSA to consider so-called "vocational factors" (the claimant's age, education, and past work experience), and to determine whether the claimant is capable of performing other jobs existing in significant numbers in the national economy. §§ 404.1520(f), 404.1560(c), 416.920(f), 416.960(c).

6

*Barnhart v. Thomas*, 540 U.S. 20, 24-25 (2003)(footnotes omitted).

Hence, as a general matter, a claimant seeking benefits under the Act may establish the existence of a statutory disability by (1) introducing medical evidence that she is *per se* disabled as a result of an impairment appearing in 20 C.F.R. Pt. 404, Subpt. P, App. 1 (the "Listing of Impairments") or (2) demonstrating that the functional limitations caused by her impairments effectively preclude her from returning to her past relevant work and from performing other jobs existing in significant numbers in the national economy. *Stunkard*, 849 F.2d at 59.

In an action in which review of an administrative determination is sought, the agency's decision cannot be affirmed on a ground other than that actually relied upon by the agency in making its decision. In *Securities & Exchange Commission v. Chenery Corporation*, 332 U.S. 194 (1947), the Supreme Court explained:

> When the case was first here, we emphasized a simple but fundamental rule of administrative law. That rule is to the effect that a reviewing court, in dealing with a determination or judgment which an administrative agency alone is authorized to make, must judge the propriety of such action solely by the grounds invoked by the agency. If those grounds are inadequate or improper, the court is powerless to affirm the administrative action by substituting what it considers to be a more adequate or proper basis. To do so would propel the court into the domain which Congress has set aside exclusively for the administrative agency.

*Chenery Corporation*, 332 U.S. at 196. The United States Court of

7

Appeals for the Third Circuit has recognized the applicability of this rule in the Social Security disability context. *Fargnoli v. Massanari*, 247 F.3d 34, 44, n. 7 (3d Cir. 2001). Thus, the Court's review is limited to the four corners of the ALJ's decision.

## IV. Discussion

In his opinion, the ALJ noted that since Pack was insured for DIB through December 31, 2002, there was a window of time for her to establish the existence of a statutory disability subsequent to the January 25, 2002, denial of her previous claims. (R. at 18). He observed that she had not engaged in substantial gainful activity since her alleged onset of disability. (*Id.*). Moving on to the second step of the sequential evaluation process, the ALJ determined that Pack suffered from "degenerative disc disease of the cervical spine with disc herniation and status post discectomy and fusion at C5-C6, left shoulder tendonitis and osteoarthritis, a history of neuroma involving the left wrist, and deQuervain's tenosynovitis with status post release and revision involving the left wrist." (R. at 19). Although these impairments were deemed to be "severe" for purposes of 20 C.F.R. §§ 404.1520(a)(4)(ii), 404.1520(c), 416.920(a)(4)(ii) and 416.920(c), they did not meet or medically equal an impairment appearing in the Listing of Impairments. (*Id.*). In accordance with 20 C.F.R. §§ 404.1545 and 416.945, the ALJ determined that Pack had the residual functional capacity to perform sedentary work with a sit/stand option. (*Id.*).

8

Pack was not found to be suffering from any nonexertional impairments. (*Id.*). Given this assessment, the ALJ concluded that Pack could not return to her past relevant work. (R. at 23). Nonetheless, he determined that she was capable of working as a telephone operator, a product inspector, or an assembler. (R. at 22). Kinley's testimony established that these jobs existed in the national economy for purposes of the Act. (R. at 537-541). Consequently, Pack was not found to be statutorily disabled. (R. at 23).

In support of her motion for summary judgment, Pack advances four arguments. First, she argues that the ALJ erred in determining her residual functional capacity by failing to incorporate limitations in dexterity in her upper left extremity (i.e., her left arm and hand). (Doc. No. 14 at 7-10). Second, she contends that the ALJ erred in determining that she had no severe mental impairments. (*Id.* at 10-13). Third, she asserts that the ALJ had no justifiable basis for giving the opinions of three physicians zero weight. (*Id.* at 13-15). Fourth, she argues that the ALJ's evaluation of her credibility is not supported by substantial evidence. (*Id.* at 15-18). Pack bases her fourth argument on an allegation that the ALJ harbored a bias against her. (*Id.* at 17-19). After a thorough review of the administrative record, the Court is convinced that Pack's arguments have merit, and that a remand for further proceedings is required. The ALJ's

9

residual functional capacity determination is not "supported by substantial evidence" for purposes of § 405(g). Since all of the specific issues raised by Pack are interrelated with the ALJ's residual functional capacity assessment, the Court will address them together.

The ALJ's evaluation of the evidence was fraught with incorrect statements and mischaracterizations of the record. Unfortunately, this appears to be a case in which the ALJ may have had "an unshakable commitment to the denial of this applicant's claim." *Sarchet v. Chater*, 78 F.3d 305, 309 (7th Cir. 1996). The tone of both the ALJ's questioning of Pack at the hearing and the language in his opinion suggests that he viewed much of Pack's medical evidence with an unwarranted degree of skepticism. The ALJ's apparent unwillingness to give serious consideration to Pack's evidence is shocking to the Court's sense of justice. The Commissioner will have to reevaluate all of the evidence on remand, since the unfairness of the administrative proceedings in this case has rendered the ALJ's analysis unreliable. *Ventura v. Shalala*, 55 F.3d 900, 902-905 (3d Cir. 1995).

Pack argues that the ALJ erred in concluding that her major depressive disorder was not a "severe" impairment.[1] (Doc. No. 14

---

[1]

The regulations implementing the Social Security Act provide that "[a]n impairment or combination of impairments is not severe if it does not significantly limit [one's] physical or mental ability to do basic work activities." 20 C.F.R. §§ 404.1521(a), 416.921(a).

at 10-13). She contends that her mental impairments were sufficiently severe to overcome the Commissioner's *de minimis* threshold at the second step of the sequential evaluation process. The second step is generally viewed as "a *de minimis* screening device to dispose of groundless claims." *Newell v. Commissioner of Social Security*, 347 F.3d 541, 549 (3d Cir. 2003). To surmount this hurdle, a claimant need only demonstrate that he or she suffers from something more than a "slight abnormality" (or a combination of slight abnormalities) which has no more than a minimal effect on his or her ability to work. *McCrea v. Commissioner of Social Security*, 370 F.3d 357, 360 (3d Cir. 2004). Hence, in this context, the meaning of the word "severe" cannot be equated with the word's typical meaning. The purpose of the second step of the sequential evaluation process is to dispose of claims in which a claimant fails to make a "reasonable threshold showing" that his or her impairment is "one which could conceivably keep him or her from working." *McDonald v. Secretary of Health and Human Services*, 795 F.2d 1118, 1122 (1st Cir. 1986).

---

The term "basic work activities" refers to "the abilities and aptitudes necessary to do most jobs." 20 C.F.R. §§ 404.1521(b), 416.921(b). Examples of such "abilities and aptitudes" include: "(1) Physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; (2) Capacities for seeing, hearing, and speaking; (3) Understanding, carrying out, and remembering simple instructions; (4) Use of judgment; (5) Responding appropriately to supervision, co-workers and usual work situations; and (6) Dealing with changes in a routine work setting." 20 C.F.R. §§ 404.1521(b), 416.921(b).

It is important to note that Pack's *claims* were not denied at the second step of the process. Because the ALJ concluded that Pack suffered from severe physical impairments, this case proceeded to the third, fourth and fifth steps. (R. at 19-23); *Newell*, 347 F.3d at 546 ("If the evidence presented by the claimant presents more than a 'slight abnormality,' the step-two requirement of 'severe' is met, and *the sequential evaluation process should continue*.")(emphasis added). The Court acknowledges that "because step two is to be rarely utilized as a basis for the denial of benefits, its invocation is certain to raise a judicial eyebrow" when it is employed for *that* purpose. *McCrea*, 370 F.3d at 361 (internal citations omitted). Where an impairment is not found to be severe under circumstances such as this, in which other impairments meet that threshold and send the case to the later steps of the analysis despite the challenged determination of nonseverity, the nonseverity determination is sometimes inconsequential. After all, the Commissioner's residual functional capacity assessment must account for the limitations caused by *all* of the claimant's impairments, including those which are not "severe." 20 C.F.R. §§ 404.1545(a)(2) and 416.945(a)(2). As long as the *claim* has progressed beyond the second step of the process, the critical question is not whether the nonseverity determination was *itself* incorrect, but whether that determination caused the Commissioner to overlook (and, hence, not account for) a functional

12

limitation resulting from the impairment at issue. In this case, the record clearly establishes that the ALJ overlooked (or, perhaps, *refused* to acknowledge) the evidence of Pack's mental impairments. Thus, he did not properly consider what limitations, if any, resulted from these impairments.

Dr. Sadie Strick performed a psychological examination of Pack in late 2001. Pack was diagnosed as having a major depressive disorder. (R. at 247). On December 31, 2001, Dr. Strick reported that Pack had a poor (or nonexistent) ability to relate to co-workers, deal with the public, or deal with work stresses. (R. at 248). In a report dictated on January 5, 2002, Dr. Strick acknowledged that Pack was receiving medication for her mental impairments that had been prescribed by her primary care physician, Dr. Diana Lemley. (R. at 247). Dr. Strick's evaluation of Pack was apparently in connection with her earlier applications for DIB and SSI, which were ultimately denied by the state agency on January 25, 2002.

The documentary evidence of Pack's appointments with Dr. Lemley support Dr. Strick's observation that Pack was taking medication for depression. Dr. Lemley's treatment notes are largely illegible, making it difficult for the Court to determine precisely what they say. At the hearing, the ALJ and Pack's counsel both observed that the meaning of Dr. Lemley's treatment notes were difficult to ascertain. (R at 536). Nevertheless, the Court has

examined them very closely, and it appears that Prozac (an anti-depressant) is mentioned in a treatment note. (R. at 289). The note was written when (or shortly after) Pack underwent a physical examination. Unfortunately, the date of the examination is not clear, since the person who completed the form mistakenly listed Pack's birthday in the space provided for the date of the visit (or the date of the subsequent documentation). (*Id.*). Moreover, a separate treatment note indicates that Pack was suffering from panic attacks in 2002. (R. at 293).

Despite the existence of evidence that Pack was suffering from mental impairments in 2002, for which she had been prescribed medication, the ALJ made the following observations in his opinion:

> The examination by psychologist Dr. Strick conducted about a year prior to the date the claimant was last insured shows that she was not on a medications [sic] or participating in mental health therapy at that point. She displayed no significant impairment in communication skills, memory, or thought processes. There is nothing in Dr. Strick's examination to justify his opinion that the claimant would be poor with respect to her ability to deal with coworkers or the public, and handle work stresses, and I afford no weight to that opinion, as it is totally inconsistent with the medical record (Exhibit B-5F).

(R. at 18-19). His finding that Pack was not taking medication for her depression, of course, is flatly contradicted by the documentary evidence.

A close examination of the hearing transcript reveals that the ALJ was aware of this evidence, and that he apparently did not want

14

to consider it. Early in the hearing, the following exchange occurred:

[ALJ]: In Exhibit 11E, which was your medication, you indicated that you were taking medication for depression and panic attacks. Who prescribed those medications for you, ma'am?

[Pack]: Dr. Diana Lemly.

[ALJ]: Okay. And when did she prescribe them to you?

[Pack]: In 2000 and, I believe it was 2001.

[ALJ]: You indicate that she prescribed them to you in the year 2002. Now, your last date insured was December 31, 2002, so it's very important to go over exactly when you were found to have depression and panic attacks.

ALJ: Counsel, can you show me where in the record the claimant was diagnosed with depression and panic attacks?

ATTY: All right, let me, let me check, Judge. I was, I think there was a [INAUDIBLE]. Judge, I'm looking, I'm not sure I can do that right this exact moment. I was, what I was looking for, I know Dr. Lemly wrote us a letter, but she's dealing more with the, the physical problems and the surgeries that she had.

ALJ: Well, the problem is this, as far as I'm aware of, the claimant has never, ever, ever, at any time we're dealing with, ever been diagnosed with any mental impairment of any kind, not by any qualified practitioner. Neither Dr. Lemly nor any other medical doctor nor any psychologist has ever diagnosed her with a mental disorder at any time within the relevant time frame for this particular proceeding. And as far as the relevant time frame is concerned it would be after January 21st, 24th, 2002.

ATTY: Right. Well, Judge, I was, I, what I would like to do, do is, and I'm not going to be

15

able to do it right now when we're sitting here, it's going to take me too much time, is to look and see what, what records we have from Dr. Lemly. I would, Dr. Lemly at some point did begin that prescription. I would agree with you that she hasn't sought any treatment from a psychiatrist or a psychologist necessarily.

ALJ: I have nothing that indicates the claimant has been, has been diagnosed nor given any prescription for any medical impairment medication at any time except for Exhibit B11E, which appears to have been prepared in the year 2004.

ATTY: Well, there is a report from, a consultative exam from Dr. Strick.

ALJ: What exhibit, what exhibit is that?

ATTY: B5F.

ALJ: B5F. Okay, let me take a look at that. Yeah, that was from January 2002, which predates the last, prior denial. So unless I reopen the denial of 2002 there's no basis upon which I can even look at that document now.

ATTY: Okay. Well, in the prior denial, actually, Judge, it was, it was an initial denial. I don't believe that there was an appeal.

ALJ: There was a final determination and the claimant never appealed it. So it's final upon the claimant unless I reopen the denial.

ATTY: Right. And, and I believe the--

ALJ: Now, in other words, it doesn't [INAUDIBLE] about whether it was an ALJ decision nor whether it was an Appeals Council decision nor whether it was on remand, nor was it on reconsideration. The plain fact is, is that the claimant is locked in by that prior denial unless I reopen it.

ATTY: Well, and I guess--

16

ALJ:      It doesn't matter, you know, we can call it
          anything we like to, but the problem is that
          it seems to be final upon the claimant.

ATTY:     Well, right, Judge.  But I would, but I, in
          spite of the fact that it, this predates the,
          the prior denial, I, but I don't, I wouldn't
          necessarily say that doesn't mean that she
          hasn't been diagnosed and she's not getting
          treatment for it.

ALJ:      Actually, I was very, very precise about that.
          I said that on the record, as far as I can
          recall, there is nothing in the relevant time
          frame after January 24, 2002 to show that the
          claimant has ever been diagnosed or given any
          medication for any mental impairment by any
          qualified practitioner from January 24, 2002
          until the present date, with the exception of
          Exhibit B11E.  So, that was a red flag for
          you, counsel, you should have been aware that
          that was an issue that would come up.

ATTY:     Okay.  Well, Judge, I would also say that she,
          the claimant has filed another petition within
          a, within a year of the, the, she had a
          petition that she filed in '01, which was
          denied on the 1-24-02.  There was a, it was
          not a ALJ decision.  And she filed another
          petition in, which is the current application,
          which is '03.  So it's within the time period
          to open up, which allows you to open prior
          applications.

ALJ:      I'm not talking about whether I can reopen it.
          What I'm saying is that there's nothing that
          shows me that the claimant has in fact been
          diagnosed nor been prescribed any medication
          for any mental impairment between January 24,
          2002 and the present date.  So this is coming
          out of left field from the claimant.   It
          raises questions about credibility.

ATTY:     Okay.  Well, Judge, I, what I can do is, if
          you, if you're willing to leave the record
          open we could, we could get a statement from
          Dr. Lemly that would cover, since Dr., Dr.
          Lemly has been her--

                          17

ALJ:      She's also been--

ATTY:     -treating doctor.

ALJ:      -historically involved in submitting welfare
          assessments, which are, you know, it raises
          questions about Lemly's credibility.  So, I
          don't know.  I'll leave it up to you, counsel.

ATTY:     Okay.

ALJ:      It's up to you.  But if you submit anything
          further from any qualified practitioner
          indicating that this issue is in fact before
          me I will certainly consider it.

ATTY:     Okay.

ALJ:      But as far as I'm aware from the record
          there's nothing that indicates to me that
          mental impairment is in fact a genuine issue
          in this proceeding.  I just wanted to let you
          know that.

(R. at 514-518).  The tone of the ALJ's remarks indicated that he

did not wish to look at Dr. Strick's examination report.  Moreover,

the ALJ's indication that he could not consider Dr. Strick's report

was manifestly incorrect.   There is no rule prohibiting the

Commissioner from considering *documentary evidence* created in

connection with a prior adjudication merely because the

adjudication *itself* is not being reopened.  *Hamlin v. Barnhart*, 365

F.3d 1208, 1215 (10th Cir. 2004)("Finally, even if a doctor's

medical observations regarding a claimant's allegations of

disability date from earlier, previously adjudicated periods, the

doctor's observations are nevertheless relevant to the claimant's

medical history and should be considered by the ALJ."); *Frustaglia*

18

*v. Secretary of Health & Human Services*, 829 F.2d 192, 193 (1st Cir. 1987)(per curiam)("An ALJ is entitled to consider evidence from a prior denial for the limited purpose of reviewing the preliminary facts or cumulative medical history necessary to determine whether the claimant was disabled at the time of his second application."). Consideration of Dr. Strick's examination report for the purpose of determining whether Pack had begun to take medication for her depression by the beginning of 2002 would not have constituted a reopening of the prior administrative determination. *Hamlin*, 365 F.3d at 1215, n. 8; *Burks-Marshall v. Shalala*, 7 F.3d 1346, 1348, n. 6 (8th Cir. 1993); *Girard v. Chater*, 918 F.Supp. 42, 44-45 (D.R.I. 1996). Furthermore, the ALJ's comments to Pack's counsel about Dr. Lemley's credibility evinced a predisposition on his part to discount any evidence of Pack's medication regimen provided by Dr. Lemley's office subsequent to the hearing.

A later exchange during the hearing indicates that the ALJ did, in fact, know that the record contained a treatment note from Dr. Lemley's office which referenced Pack's panic attacks. The hearing transcript states as follows:

[ALJ]: Right now I'm looking at Exhibit B9F, which is listed in the record as materials from Comprehensive Medical Group, PC, which is Dr. Lemly's operation. And much of the material in B9F was actually not by Dr. Lemly or any qualified source, but rather it was by the clerical staff who worked in Dr. Lemly's office. So my question is, Ms. Pack, did you ever see Dr. Lemly in the year 2002?

19

[Pack]:   Yes, I've seen her, I've been a patient of Dr. Lemly's for--

[ALJ]:    I'm talking about year 2002.

[Pack]:   Yes.

[ALJ]:    Okay. Because an LPN, Joan Rio, Rios, Riordan or something like that, she signed off as the person you spoke to. She claims to be an LPN. And she prepared the report indicating that you claim to have four daily panic attacks for two weeks.

[Pack]:   I've never, I've never even heard of her.

[ALJ]:    Well, she's a LPN, she works for Dr. Lemly.

[Pack]:   Joan?

ALJ:      Counsel, let me show you this, this note.

ATTY:     Yeah, Judge.

ALJ:      I can't read it. I can't read the name. It's obviously not Dr. Lemly. Four daily panic attacks for two weeks. And, and the person is apparently some LPN. L-O-V-E--

ATTY:     Yeah, it's--

ALJ:      -R-A-O?

ATTY:     I would agree with you, it's hard to read, Judge.

ALJ:      Anyway, the, the problem is, there's nothing, nothing to indicate that the claimant ever saw her actual treating doctors about the, any mental impairment issue.

ATTY:     Well, Judge, that's what I, I had said before that I was going to try to get some sort of confirmation from Dr. Lemly about her, her, Ms. Pack's treatment and when she first, you know, first diagnosed her and first gave her a prescription for any of the antidepressants.

20

ALJ:        Yeah.    Because  the  most  recent  list  of
           medications does not indicate that any doctor
           found that she had depression or panic attacks
           prior to 2002 and there's nothing that shows
           in the record that indicates that any doctor
           did actually find that it took place in the
           year 2002.  Okay.

(R. at 535-537).  Subsequent to the hearing, a note from Dr. Lemley
was made a part of the record.  The note, which was dated March 15,
2005 (the same date as the hearing), stated that Pack had been on
antidepressants (Celexa and Prozac) for insomnia and depression
since September 4, 2001.  (R. at 488).  Unfortunately, this note is
itself barely legible, making it difficult for the Court to
understand its contents.  Nevertheless, it appears to state that
Pack's medication was increased on February 4, 2002, due to
depressive symptoms.  (*Id.*).  This statement is corroborated by an
earlier treatment note dated February 4, 2002, which is the mostly
illegible note discussing Pack's panic attacks to which the ALJ
referred at the hearing.  (R. at 293).  Thus, the ALJ had no reason
to question Pack's credibility as to the simple question of whether
she had taken prescription medications for her mental problems
during the relevant period of time.

     Despite the clear evidence of record indicating that Pack had
been taking prescription medications for her depression in 2002,
the ALJ apparently refused to believe it.  In his opinion, he
declared:

     It is noted that Exhibit B74F contains a single page

                                21

prescription note alleging the claimant has been prescribed Prozac since 2001 for "depressive symptoms." In her list of medications Exhibit B11E reports she is on that medication since 2002 for "panic attacks" and "depression." It is obvious that both Exhibit B11E and Exhibit B24F cannot be given any weight as obviously concocted for use in this proceeding. Included there is no indication of any severe mental limitation.

(R. at 21-22). Having intimated at the hearing that he questioned Pack's sincerity, that he did not trust Dr. Lemley, and that he could not look at Dr. Strick's examination report, the ALJ appears to have inexplicably closed his eyes to any and all evidence purporting to establish that Pack had been suffering from mental impairments during the relevant period of time. It is not clear to the Court why the ALJ was unduly suspicious of Pack's assertions concerning her mental impairments. In any event, however, his apparent refusal to acknowledge the existence of these impairments evidently prevented him from conducting a meaningful inquiry as to whether they resulted in functional limitations. Since this issue was not properly examined, the Court cannot determine what effect, if any, Pack's mental impairments may have had on the ALJ's residual functional capacity assessment in this case. Hence, Kinley's testimony does not constitute "substantial evidence" to support the ALJ's conclusion that jobs existed in the national economy which were consistent with Pack's vocational and residual functional capacity assessments. *Burnam v. Schweiker*, 682 F.2d 456, 458 (3d Cir. 1982)("The fact that work exists in the national

economy for a person who *only* has Burnam's exertional impairments, or for a person who *only* has his nonexertional impairments, does not mean that work exists in the national economy for a person who suffers from *both* types of impairments simultaneously.")(emphasis in original).

It is, of course, true that Pack's mental impairments could not have had an effect on her residual functional capacity without resulting in functional limitations. *Pearson v. Barnhart*, 380 F.Supp.2d 496, 505 (D.N.J. 2005)("Residual functional capacity is defined as that which an individual is still able to do despite the *limitations* caused by his or her *impairments*.")(emphasis added). This issue, however, was never explored because of the ALJ's dismissive attitude about Pack's mental impairments (and possible nonexertional limitations). Although the ALJ relied on reports from other physicians to explain his basis for concluding that Pack's exertional limitations did not prevent her from engaging in substantial gainful activity, he relied on no countervailing evidence to reject Dr. Strick's opinion as to her nonexertional limitations. (R. at 18-19). While an ALJ may reject the opinion of a treating or examining physician that is contradicted by other evidence, such a rejection cannot be based solely on "his or her own credibility judgments, speculation or lay opinion." *Morales v. Apfel*, 225 F.3d 310, 318 (3d Cir. 2000). The Court is also concerned about the ALJ's mischaracterization of Dr. Strick's

23

report. The ALJ stated that, at the time of Dr. Strick's consultative examination, Pack was not taking medications for her mental impairments. (R. at 18). That statement appears to be false, since Dr. Strick's own report indicates that Pack was taking Celexa at that time. (R. at 245). Dr. Strick specifically noted that Pack was "relying on medications to alleviate her mood problems." (R. at 246). Instead of making a good faith effort to properly evaluate Dr. Strick's opinion, the ALJ simply stated that he was according it "no weight."[2] (R. at 18-19).

Pack acknowledges that her mental impairments alone did not necessarily result in a disability. (Doc. No. 14 at 12-13). Nonetheless, she argues that a remand for further proceedings is required because of the ALJ's failure to consider her nonexertional limitations. Under the heading entitled "recommendations," Dr. Strick stated as follows:

Claimant is under Dr. Lemly's care at Mercy Behavioral Clinic by her report. She is lethargic and slow to respond and appears to be preoccupied with pain in her hand. Other than medication, she is not receiving any other mental health care. It is difficult to get additional information from her and she appears to be quite resigned to her situation. It would be helpful for her to receive mental health care in order for her to be able to function in an employment situation. Duration of impairment is unknown and will be determined by her response to treatment protocols.

---

2

The ALJ apparently looked at Dr. Strick's examination report despite his statement at the hearing indicating that he could not consider it without reopening the state agency's determination of January 25, 2002.

(R. at 247). Dr. Strick made these observations just three weeks before the state agency's denial of her applications for benefits on January 25, 2002, which marked the beginning of the period of time relevant to the instant case. Since there was no evidence which contradicted Dr. Strick's opinion as to Pack's inability to relate to co-workers, deal with the public or deal with work stresses, the evidence of record clearly established the existence of some nonexertional limitations. (R. at 248). The ALJ's residual functional capacity assessment did not account for these limitations, nor did his hypothetical question to Kinley convey them. (R. at 539-540). Hence, Kinley's testimony did not constitute "substantial evidence" of jobs existing in the national economy which were consistent with Pack's vocational and residual functional capacities. *Ramirez v. Barnhart*, 372 F.3d 546, 552-555 (3d Cir. 2004).

Pack also argues that the ALJ erred in not determining that she had exertional limitations in her upper left extremity. (Doc. No. 14 at 7-10). The Court acknowledges that the ALJ's residual functional capacity assessment purported to find Pack capable of performing *any* "sedentary work which would allow her to sit or stand at her discretion." (R. at 21). Nevertheless, the transcript of the hearing indicates that the ALJ actually incorporated *impairments* into his hypothetical question to Kinley

25

that were not reflected in his ultimate residual functional capacity determination. The exchange occurred as follows:

[ALJ]: Assuming that the person that we're dealing for purposes of this hypothetical is at present time 45 years of age, she has a GED education, she has the same past relevant work experience as the claimant. This person has a herniated disc at C5, C6 with discectomy and fusion. She has left shoulder tendinitis, arthritis. She has had hardware implanted. She also has a history of a neuroma of the left wrist and revision of DeQuervain's release of the left wrist. She's limited exertionally to not more than sedentary exertion. This person claims to have a mental disorder and also to have impaired concentration because of her prescription medications. There's no corroboration of that. However, it appears that the claimant is limited to sedentary work, not more than sedentary work. And it is probable that she needs a sit/stand option. Within the hypothetical would she be able to return to her past relevant work? If not, could she perform in any significant number of other jobs available in the national economy at the sedentary exertional level with respect to entry level jobs?

[Kinley]: None of the past work would be relevant, or, would be able to be performed by such a person. With the limitations outlined it would be too heavy in terms of lifting, carrying and everything else. There are some sedentary jobs that are entry level that provide an option of sitting or standing in the national economy. And examples of such jobs would include, in my judgment, a telephone operator with the speed dialing systems and the headsets and the touch pads, that job would be appropriate. There exist about 92,000 sedentary jobs nationwide. Such a person would be able to do work in production as an inspector, a checker, an examiner. There are about 38,000 sedentary jobs nationwide. Such a person would be able

26

> to do a portion of the jobs as an assembler.
> Not all of those jobs give a sit/stand option
> and I'd reduce that number. I'd reduce it by
> 50 percent. The total number of sedentary
> assembly jobs is about 156,000. I would
> reduce it down to about 75,000.

(R. at 539-541). It is not clear whether Kinley incorporated any *limitations* caused by Pack's upper left extremity *impairments* when she identified jobs consistent with the applicable vocational and residual functional capacity assessments. The ALJ clearly discussed Pack's *impairments*, but he did not translate them into resulting *limitations*.

The vagueness of the ALJ's hypothetical question to Kinley (as to whether Pack's upper left extremity impairments resulted in functional limitations) would independently necessitate a remand if it were clear that Pack had functional limitations that were not accurately conveyed to Kinley. *Burns v. Barnhart*, 312 F.3d 113, 122-124 (3d Cir. 2002). Nevertheless, not every limitation *alleged* by a claimant need be conveyed to the vocational expert in order for that expert's testimony to constitute substantial evidence of the existence of jobs that the claimant is capable of performing. Only those limitations which are *credibly established* need be incorporated into the hypothetical question. *Rutherford v. Barnhart*, 399 F.3d 546, 554 (3d Cir. 2005). The ALJ apparently concluded that Pack's upper left extremity impairments did not result in functional limitations. (R. at 20-21)("Despite the

27

claimant's assertions regarding continuing complaints of significant pain and problems involving her left upper extremity, the record from her treating sources indicate significant improvement in her clinical status following her cervical discectomy and fusion in July 2004."). At this point, the Court need not determine whether this factual finding is *itself* supported by substantial evidence for purposes of § 405(g), since it is clear that a remand is warranted for other reasons. It suffices to say that the Commissioner should take another look at this issue on remand.

Pack contends that the ALJ improperly questioned her about her alleged use of alcohol. (Doc. No. 14 at 17-18). The Court notes that, under the Act, an individual cannot be deemed to be "disabled" if alcoholism or drug addiction would be "a contributing factor material to the Commissioner's determination that the individual is disabled." 42 U.S.C. §§ 423(d)(2)(C) and 1382c(a)(3)(J). If the Commissioner chooses to rely on a claimant's use of alcohol as a basis for discounting limitations, he must first establish that such limitations would not exist but for the claimant's use of alcohol. *Sklenar v. Barnhart*, 195 F.Supp.2d 696, 701-706 (W.D.Pa. 2002). At the hearing, the ALJ questioned Pack about her past use of alcohol, which he contended had resulted in the termination of her prior disability benefits in September 1999. (R. at 518-519). Nonetheless, the ALJ clearly

28

stated on the record that he had no basis upon which to conclude that alcoholism was a material issue in Pack's case. (R. at 519). Alcoholism was not relied upon as a basis for the ALJ's ultimate determination. Thus, the Court need not examine that issue further.

In her brief, Pack makes several arguments concerning the weight (or lack thereof) given to both her testimony and the opinions of her treating physicians. (Doc. No. 14 at 13-19). Credibility determinations are, of course, the province of the Commissioner. *Newhouse v. Heckler*, 753 F.2d 283, 286 (3d Cir. 1985). Congress has provided that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive[.]" 42 U.S.C. § 405(g). Hence, the Court's function in this context is limited to determining whether the Commissioner's findings are "supported by substantial evidence" within the meaning of § 405(g). The Court is troubled by the ALJ's failure to accord *any* weight to the opinions expressed by some of Pack's treating and examining physicians. In any event, however, the Court need not engage in a particularized analysis of the weight given to each portion of the record beyond what has already been said, since it is clear that a remand is needed for the reasons given in this opinion. It suffices to say that, on remand, the Commissioner must give *serious* consideration to *all* of the evidence contained in the record, including the

opinions expressed by Pack's treating and examining physicians and Pack's subjective complaints about pain. *Mason v. Shalala*, 994 F.2d 1058, 1065-1068 (3d Cir. 1993). The Court expresses no opinion as to whether Pack is entitled to benefits under the Act, since that determination is for the Commissioner to make. The Court holds only that, in light of the present state of the record and the inadequate analysis of Pack's mental impairments provided by the ALJ, the Commissioner will have to take another look at Pack's case. Accordingly, the Court must grant Pack's motion for summary judgment (insofar as it seeks a vacation of the Commissioner's decision, and a remand for further administrative proceedings) and deny the Commissioner's motion for summary judgment.

AND NOW, this ____ day of April, 2008, IT IS HEREBY ORDERED that Pack's motion for summary judgment (Doc. No. 13) is GRANTED and that the Commissioner's motion for summary judgment (Doc. No. 15) is DENIED. Pursuant to the power vested in this Court by the fourth sentence of § 405(g), the decision of the Commissioner is hereby vacated, and the case is remanded to him for further administrative proceedings in accordance with this opinion.

BY THE COURT:

Gary L. Lancaster,
United States District Judge

cc: All Counsel of Record

30